FILED

2016 May-23  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **DARRON MCCALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action Number** |
| | ) | **1:14-cv-00475-AKK-JHE** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Darron McCall filed this *pro se* suit seeking monetary damages pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*., asserting he did not receive appropriate medical care during his incarceration at FCI Talladega in Talladega, Alabama.[1] Doc. 4. The United States is the only defendant.[2] *Id.* McCall seeks one million dollars based on the alleged medical negligence of employees of the United States. *Id.* at 1. The United States has now moved for summary judgment on the sole FTCA claim. *See* doc. 39. Notwithstanding that the court

---

[1] On December 31, 2015, the court received a motion for an extension from McCall because of "a transition of custody from this F.C.I. (Medium) to a residential reentry center . . . ." Doc. 37. Since that time, McCall has not provided the court with an updated address. However, according to the Bureau of Prisons website, McCall is now at a residential reentry center in Montgomery, Alabama—RRM Montgomery, Maxwell AFB, Bldg. 1209, 820 Willow Street, Montgomery, AL 36112. While the court has no obligation to look for McCall, the Clerk of Court is requested to update his address accordingly.

[2] Although McCall also named FCI Talladega as a defendant, the court previously informed him that the United States is the only proper defendant in a FTCA claim. *See* doc. 11 at 2 n.1; 28 U.S.C. §§ 2671-2680; 28 U.S.C. § 1346(b). Accordingly, the claim against FCI Talladega is **DISMISSED WITH PREJUDICE**.

directed McCall to respond by February 22, 2016 and informed him that failure to do so could lead to a grant of the United States' motion, *see* doc. 40, McCall has not filed a response. For the reasons outlined below, the court finds that summary judgment is due to be granted.

## I. Standard of Review

Under Federal Rule of Civil Procedure 56(a) summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no

genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is pro se, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). "*Pro se* pleading are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).

## II. Summary Judgment Facts

McCall alleges that he received negligent medical care during his incarceration at FCI Talladega. *See generally* doc. 4. Specifically, he claims that the health care personnel at FCI Talladega failed to properly diagnose and treat his chronic sinus problems. *Id.* at 1-2. McCall maintains that he has suffered permanent sinus damage, chronic nose bleeds, and pain and suffering as a result of

a lengthy delay before his nasal polyp surgery, improper prescriptions for steroids, and negligent follow-up after the surgery. *Id*. at 1-3. Moreover, FCI Talladega's purported failure to adhere to the surgeon's follow-up care instructions have caused McCall increased pain and difficulty breathing. *Id*. at 1.

McCall claims that he arrived at FCI Talladega on January 27, 2012 but was not seen by an Ear, Nose, and Throat ("ENT") specialist until seven months later. *Id*. at 2. Allegedly, after the ENT visit, the prison failed to provide McCall with his prescribed nasal spray and failed to comply with the ENT's direction that McCall return within thirty days for another consult. *Id*. On January 31, 2013, McCall had a CT scan of his sinuses and, as a result of that scan, McCall returned to the ENT on May 29, 2013. *Id*. McCall then waited until July 17, 2013 for sinus surgery. *Id*. at 2-3. McCall asserts that this delay falls within Alabama's "medical negligence" standard. *Id*. at 3. Moreover, after a follow-up appointment with the ENT on September 14, 2013, the prison staff purportedly failed to comply with the instruction to return McCall to the ENT in three to four weeks for further follow up. *Id*. at 3.

McCall's medical records tell a slightly different story. Upon his January 27, 2012 entry into FCI Talladega, McCall complained of polyps in his sinuses that

caused headaches and was diagnosed with hypertrophy of nasal turbinates.[3] Doc. 36-1 at 7, 106. He also reported a sinus polypectomy in 2001 and stated that he still suffered from chronic congestion and bleeding. *Id.* at 115-16. At sick call on February 16, 2012, McCall complained that both his nasal passages were clogged, he had trouble breathing, and sometimes blowing his nose caused a nosebleed. *Id.* at 98. He also reported that he had a history of snorting cocaine. *Id.* at 98-99. Laureano Marasigan, MLP,[4] the practitioner who evaluated McCall, requested that the prison refer McCall to an ENT for evaluation and management. *Id.* at 99.

On March 22, 2012, McCall saw Mounir Mourtada, MLP, for chronic sinus congestion and a runny nose and was prescribed antibiotics and a steroid. *Id.* at 94-95. X-rays in May 2012 of McCall's sinuses revealed maxillary sinus disease. *Id.* at 87-89, 93, 134. Based on the x-ray results, the reviewing radiologist and Joel Hernani, MLP, recommended a CT scan. *Id.* at 89, 134.

On July 5, 2012, McCall saw Honorio Dela Cruz, MLP, for complaints of congestion and sinus pain causing headaches. *Id.* at 83. After diagnosing McCall

---

[3] A patient who suffers from hypertrophy of nasal turbinates has enlargement of the small structures within his nose that cleanse and humidify air as he breathes.  The most common symptoms of turbinate hypertrophy are congestion, trouble breathing, chronic nosebleeds, and chronic sinus infections.  Nasal steroid sprays can treat these symptoms. Johns Hopkins Medicine, "Conditions We Treat: Septal Deviations and Tu[r]binate Hypertrophy," http://www.hopkinsmedicine.org/otolaryngology/specialty_areas/sinus_center/conditions/septal_ deviations.html (last visited May 15, 2016).

[4] "MLP" stands for mid-level practitioner. *See* 21 C.F.R. § 1300.01 ("Examples of mid-level practitioners include, but are not limited to, health care providers such as nurse practitioners, . . . clinical nurse specialists and physician assistants who are authorized to dispense controlled substances by the State in which they practice.").

with inflamed turbinates and a perforated septum, Dela Cruz, like Mourtada, prescribed an antibiotic and steroids, and his notes reflect that an ENT consultation had been approved. *Id.* at 83-84. When McCall reported two weeks later that his condition had not improved, Mourtada responded that further prescriptions were not recommended and encouraged McCall to purchase over-the-counter sinus medication from the commissary. *Id*. at 81-82. McCall saw Mourtada again on August 9, 2012 and requested antibiotics and steroids. *Id*. at 74. Mourtada prescribed a nasal spray but again informed McCall that he did not recommend steroids and antibiotics because they had proven ineffective. *Id*. at 75. On August 28, 2012, McCall told Dela Cruz that the only effective treatment for his sinuses were antibiotics and steroids and that neither the allergy pills nor his nasal spray had relieved his symptoms. *Id*. at 70.

On August 29, 2012, McCall saw otolaryngologist Dr. R.H. Hurlbutt, who diagnosed McCall with dramatic rhino sinus polyposis and a large septal defect, possibly due to previous cocaine use. *Id.* at 66; doc. 36-2 at 17-18.  Dr. Hurlbutt recommended nasal steroid spray and a referral to the University of Alabama at Birmingham ("UAB") for surgery. Doc. 36-2 at 17. The United States complied with this recommendation, and, on October 29, 2012, McCall saw Dr. Charles Morgan at UAB, who prescribed nasal steroid spray and an oral steroid, instructed

that McCall return in three to four weeks for a CT scan, and recommended that McCall have revision sinus surgery. *Id*. at 11-12, 14, 15.

In December 2012, Dr. William Holbrook, clinical director for FCI Talladega, reviewed Dr. Morgan's recommendations and stated he would order a CT and follow up with the ENT. Doc. 36-1 at 55. On January 22, 2013, another FCI Talladega physician, Dr. W. Lawrence, saw McCall and noted that he "[w]ill expedite CT of sinuses, so [McCall] can be seen for ENT followup." *Id*. at 40. He also prescribed a nasal spray steroid and an oral steroid. *Id.* at 41. McCall had a CT scan on January 31, 2013. *Id*. at 132. On March 8, 2013, McCall saw Joel Hernani, MLP, who renewed the two prescriptions from Dr. Lawrence. *Id*. at 29-30. Dr. Holbrook emailed McCall on March 18, 2013 and informed him, "We are trying to get you scheduled back with the surgeon to review the CT with you." Doc. 36-3 at 17.

McCall returned to Dr. Morgan at UAB on May 29, 2013 for another CT, which reflected severe chronic sinusitis and possible nasal polyposis. Docs. 36-2 at 210; 36-3 at 9. Dr. Morgan initially scheduled McCall for surgery on June 6, 2013, but for reasons not reflected in the record, the surgery did not occur until July 18, 2013. Docs. 36-2 at 102, 205; 36-3 at 9. Dr. Morgan performed the surgery on an outpatient basis and discharged McCall with instructions to follow up on July 29, 2013 for removal of packing material and debridement. Doc. 36-2 at 209, 272.

The day before the scheduled follow up with Dr. Morgan, McCall presented at the Coosa Valley Emergency Room for a nose bleed and was released the next day with instructions to use neosynephrine drops. *Id*. at 92, 234-38. After his discharge, McCall saw Dr. Morgan for follow up, where Dr. Morgan instructed McCall to use a saline nasal rinse twice a day and noted that McCall was "[i]mproving" and "[d]oing well." *Id*. at 88, 224-25. At McCall's prison six-month chronic care appointment on August 20, 2013, Dr. Lawrence noted that he had spoken with Dr. Morgan, neosynephrine was controlling McCall's sinus symptoms, and McCall needed to be scheduled for another follow-up appointment with Dr. Morgan. *Id*. at 14. The following day, McCall reported to the prison clinic for a nosebleed that stopped after application of a nasal pack and ice. *Id*. at 81-82.

On August 28, 2013, prison clinical staff noted McCall's intermittent nose bleeds and that McCall had an ENT follow up scheduled with Dr. Morgan. Docs. 36-1 at 171; 36-3 at 149. At the follow up with Dr. Morgan on September 4, 2013, McCall denied congestion and admitted he had not complied with the nasal irrigation order. Doc. 36-3 at 149. Dr. Morgan dressed his nasal passage and instructed McCall to leave it for seven days, irrigate his nasal passage four times a day after the dressing was removed, and return in three or four weeks. *Id.* at 151.

Due to a "profuse" nose bleed on September 15, 2013, McCall was taken to Coosa Valley Emergency Room. Docs. 36-2 at 67-68; 36-3 at 70. Two days later,

he presented to the prison clinic with another nose bleed. Doc. 36-1 at 153-54. Another four days later, McCall returned to Coosa Valley Emergency Room due to yet another severe nosebleed, during which the hospital diagnosed McCall with anemia. Docs. 36-2 at 56; 36-3 at 131, 140. On September 25, 2013, McCall reported that he was dizzy, nauseous, and tired. Doc. 36-2 at 47. The nurse noted that McCall's symptoms may be "related" to anemia. *Id*. at 49. Based on blood work performed on October 4, 2013, medical personnel diagnosed McCall with anemia and prescribed a blood transfusion, which occurred that day. *Id*. at 38, 41; docs. 36-2 at 161-66; 36-3 at 109-10. McCall was discharged on October 6, 2013. Doc. 36-2 at 30. The next day, McCall returned to Dr. Morgan for a follow-up appointment at UAB. Doc. 36-3 at 88-89.

On March 19, 2014, imaging of McCall's sinuses revealed "[e]xtensive bond erosion," "extensive soft tissue . . . protruding out of the right maxillary sinus into the nasal cavity and ethmoid region," and findings that were "highly suspicious" for sinonasal polyposis. *Id*. at 84. After these findings, Dr. Morgan performed another surgery on McCall's sinuses on April 29, 2014. *Id*. at 59-61, 67-69.

McCall filed this action March 18, 2014 asserting that the seventeen-month delay between his incarceration and his surgery constituted medical negligence. *See* doc. 4 at 1-2. Moreover, McCall attributes his frequent stomach and colon pain to the steroids prescribed while awaiting the surgery. Doc. 4 at 3. The United

States submits the declaration of Dr. Ivan L. Negron in support of its position that McCall's care was appropriate and that McCall's stomach pain is unrelated to his sinus issues or steroid prescriptions. *See* doc. 39-3 at 2-3. According to Dr. Negron, conservative treatment via antibiotics and corticosteroids is the first-line treatment for chronic sinusitis, and specialty consultation (and, presumably, surgical intervention) is recommended only after conservative treatment has failed. *Id*.

### III. Analysis

Because the United States cannot be sued without its consent, the FTCA provides a limited waiver of immunity for actions claiming negligence by an officer or employee of the federal government. *See* 28 U.S.C. § 1346(b)(1); *United States v. Orleans*, 425 U.S. 807, 813-14 (1976). Important here, liability under the FTCA for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government" should be determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) (reiterating that "unless the facts support liability under state law, the district court lacks subject matter jurisdiction to decide an FTCA claim") (citation omitted). As this action alleges negligence occurring in Alabama, Alabama's substantive law applies to

McCall's claims.  S*ee e.g., Gonzalez–Jiminez De Ruiz v. United States*, 378 F.3d 1229, 1230 n.1 (11th Cir. 2004) (citations omitted).

The Alabama Medical Liability Act ("AMLA"), Ala. Code § 6-5-480 *et seq*., governs medical malpractice cases in Alabama. Under the AMLA, doctors have the legal duty "to exercise the degree of care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances." *Bradford v. McGee*, 534 So. 2d 1076, 1079 (Ala. 1988); *see also* Ala. Code § 6-5-484. This duty extends to any medical professionals "who are directly involved in the delivery of health care services." Ala. Code § 6-5-481(8).

To establish a prima facie case under the AMLA, a plaintiff must produce evidence demonstrating: (1) the appropriate standard of care; (2) the doctor's deviation from that standard; and (3) a proximate casual connection between the doctor's act or omission constituting the breach and the plaintiff's injury. *Bradford*, 534 So. 2d at 1079. To meet this burden, a plaintiff must generally present expert testimony from a similarly situated healthcare provider.  *Cobb v. Fischer*, 20 So. 3d 1253, 1257, 1259 (Ala. 2009) ("[T]he AMLA . . .  require[s] a plaintiff to present expert testimony to support his or her claims, and absent the application of an exception, the failure of the plaintiff to do so is usually fatal to his or her claim."). Dispositive in this case, "[u]nless the applicable standard of care would

be obvious to a layperson, Alabama plaintiffs must 'establish the defendant physician's negligence through expert testimony as to the standard of care and the proper medical treatment.'" *Moore v. Guzman*, 362 F. App'x 50, 54 (11th Cir. 2010) (quoting *Pruitt v. Zeiger*, 590 So. 2d 236, 237-38 (Ala.1991)).   Failure to produce expert testimony in opposition to the defendant's motion for summary judgment "'results in a lack of proof essential to a medical malpractice plaintiff's case' under Alabama law." *Id*. (quoting *Pruitt,* 590 So. 2d at 238).

The United States has submitted Dr. Negron's declaration as evidence that the medical care McCall received at FCI Talladega complied with the requisite standard of care. *See generally* doc. 39-3. Therefore, the burden shifts to McCall to demonstrate through expert medical evidence that a genuine dispute of material fact exists regarding the standard of care. McCall has failed to offer any expert testimony in support of his claim that the medical personnel who treated him failed "to exercise the degree of care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise." *See Bradford*, 534 So. 2d at 1079. Specifically, McCall has failed to show that the allegedly negligent seventeen-month delay before surgery, steroid prescriptions, or the follow-up care after his surgery fell below the applicable standard of care. Based on the evidence presented, no reasonable trier of fact could conclude that the United States' conduct breached the standard of care. Moreover, even if McCall

could show deficiencies here, he has produced no evidence in support of his claim that such lack of care *caused* the damages he alleges.  Because McCall failed to meet his burden, the United States is due summary judgment.  *See e.g.*, *id.* ("[T]he plaintiff must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient."); *Brilliant v. Royal*, 582 So. 2d 512, 518 (Ala. 1991) ("In a medical malpractice case, . . . [t]here must be some evidence that the negligence probably caused the injury.") (internal quotations and citations omitted).

## CONCLUSION

In sum, the United States' motion for summary judgment, doc. 39, is due to be granted as to McCall's FTCA claim.

**DONE** the 23rd day of May, 2016.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE